I'm very happy to see so many people here, and I'm very happy to welcome my colleague, Judge Smith, from Kaltuna, Pennsylvania. He came a long way. I came six feet from my chambers to be here. But most especially, I want to welcome Judge Jane Rastani, who is, I think, one of the hardest-working judges I've ever met. And goodness knows, she helps the Third Circuit time and time again. We've been under our complement of judges for years now, and Judge Rastani fills in here and in other circuits, and it's wonderful to have her help. It's wonderful to have the warm body, but to have a warm body as brilliant as Jane Rastani makes me very happy. And so on behalf of Judge Smith and myself and the whole Third Circuit, I welcome you, Judge Rastani, and thank you. Thank you. I understand there is a motion that Judge Smith will bring. There is. I would ask if two of my law clerks would come forward, please, for purposes of being admitted to the Third Circuit. And while Kimberly Herb and Mr. Young come forward, I will append to your introduction of me, Judge Berry, the fact that they are doing duty, and have been doing duty, this year with my chambers in Altoona, Pennsylvania. So they're glad to get here to Civilization and participate in Newark and be able to visit across the river as well. They've both served extraordinarily well and actually not always under the best of circumstances this year. It's been an unusual year. Kim experienced a serious illness and emergency surgery this year, not something that we have grown accustomed to in chambers, nor want to. Chris has carried a laboring war during that and some other difficulties. Kim's back to health. They're both here and assisted in preparation for this sitting. So I am delighted to be able to move their admission. Kim will be going with the Justice Department after her service with me in September. And Chris will be returning to Manhattan, where he has practiced previously. So if I may, Judge Berry, I'd like to move the admission of Kim Herb and Chris Young to the bar of the Third Circuit. What do you think, Judge Rustani? Should we grant his motion? Or should we ask some questions? Should we ask some questions or maybe we better not? I think after due deliberation we might grant this. I think the motion will be granted. We welcome you to the Third Circuit. And may you have years of happiness practicing before this court. Thank you. We will hear argument in Hoke v. Snapple. Good morning, Your Honors. To please the Court, my name is Daniel Lipinski. Sitting to my right is Philip Tortoretti. We're of the firm of Lorenz Goldman & Spitzer in Woodbridge, New Jersey. To my far right is Michael Halfish of the firm of Finn Halfish, also in Woodbridge, New Jersey. And we are counsel for plaintiff appellant Stacey Hulk in this matter. To please the Court, I'd like to be able to reserve 10 minutes of time before we vote. Granted. Thank you very much. May I start by asking you to clarify for me, and I'll have questions for your friends across the aisle as well, where we are procedurally in this case. Initially, your friends moved to dismiss, saying all three types of preemption barred your claims. You then withdrew the juice claims, and they, both in the reply brief to Judge Cooper, and before her at oral argument, withdrew any claim of express preemption or field preemption. For reasons unclear to me, Judge Cooper decided this case on all three grounds. And you raise only field preemption in the issues presented. Maybe obstacle preemption. No, the field preemption in the issues stated is the only issue. I just wonder if you can clear up what is going on. Take a look at the blue brief and you'll see the issue that I'm talking about. Statement of Issues, page 2. But that's an issue that really should not have been before the district court in the first place, because Snapple withdrew field preemption and proceeded only on obstacle preemption, correct? Your Honor, in the district court, Snapple withdrew their argument of express preemption. Yes. In the district court, Snapple's express preemption argument was limited to the plaintiff's claims concerning the specific fruit juices contained in the Snapple beverages. And when we withdrew that claim, Snapple withdrew their express preemption argument. Well, let me cite you to page, appendix 759. Mr. Beckwith says, so there were three preemption arguments. There was express preemption, implied field preemption, and now there's implied obstacle preemption. And it's implied obstacle preemption that applies to the high fructose corn syrup natural claims. Then, subsequently, you say, at page JA776, that it's only obstacle preemption. That's before. The court went off on all three grounds. But I just want to see, have I missed anything here? I don't know that you've missed anything here, Your Honor. It's appellant stance that before the court are the obstacle preemption and field preemption issues. Well, as Judge Berry points out, those are certainly grounds reached by the district court. You won before the district court on express preemption. There's no reason for you to raise that in your blue brief. You prevailed on express preemption. However, in your brief, and I think it's at pages 19 to 21, you argue field preemption. You argue it on the merits. And by your answer to Judge Berry's initial question here, I'm wondering if somehow you viewed field preemption as still being in the case, and indeed Judge Cooper seemed to base her opinion on field preemption and to reach obstacle preemption as kind of an additional ground. Is that why you did not raise waiver here of the field preemption issue? You could have done that in your blue brief. You didn't have to do it with express preemption, obviously, because express preemption is out. You've got nothing to complain about. But if, as it would appear from the transcript that Judge Berry just read, field preemption was taken off the table by your opponent, the district court then reaches it anyway, and you have not raised waiver of that issue. Is it before us? Is it not before us? What's your position? My position, Your Honor, is that we did, in our repellent brief, excuse me, we did in our repellent brief raise the issue of field preemption. We did not argue in our briefing that Staple had waived the right fee. So you've waived the issue of waiver. I guess that's the way it could be looked at. So what we have before us now are field preemption and obstacle preemption. That's correct, Your Honor. Where did you brief obstacle preemption in your brief? Would you refer me to the pages? Because you explicitly only raised field preemption. I see the word conflict mentioned once in your brief, at page 26, in connection with the Fellmer case, and that was for another proposition. I mean, you're friends across the aisle, because I think we want to really get to the issues to the extent they're original. Sure. I think you're friends across the aisle. I think for a moment they thought they were the appellants, so they're raising issues you didn't raise, like obstacle preemption and express preemption. So we'll probably discuss those issues. But I suggest that perhaps if the issue of obstacle preemption is before us, it might be because of what your friends have done. All right. Let me move on a little bit. I want to understand what your claim is with precision. You say, quote, Plaintiff's complaint does not allege that HFCS is an artificial flavoring, end quote, just that it's not natural, because it contains, HFCS, a quote, unquote, synthesized ingredient. Therefore, it's not produced, HCFS, by a natural process. Correct? That's your complaint. Correct. Now, you also say that this case is not about a flavoring, because HFCS is not a flavor, it's a sweetener, and therefore not natural. Is that subsumed within your synthesized ingredient claim, or is that a separate claim for why the phrase all natural should not have been used? Our claim, as far as the use of the term all natural is concerned, is not directed at all towards the designation of the product being a flavor, being a color, being a chemical preservative. The basis of our all natural claim is that the product is represented as a, quote, unquote, all natural product, or a 100% natural product, but it contains an ingredient that is not all natural. It's an ingredient that is made through a highly processed procedure. Okay, is it the process, like in Lockwood, it was the process, the all natural pasta sauce. It was the process that was the claim. Here you're saying it's the synthesized process. It's not the fact that it's a sweetener versus a flavor. That's correct, Your Honor. It's not the fact that it's a sweetener versus a flavor, that we're alleging that it's not natural. We're arguing that the ingredient itself is an unnatural ingredient. Because it's gone through the addition of certain enzymes, what, two stages in the process. Yes. And that those interruptions, if you will, the application of that process has transformed what may at one point have been natural into something that is no longer natural. That's correct. And the whole subject of flavoring and natural versus artificial flavoring is something that's been introduced here by Snapple and not at all by you. If I understand your claim correctly, this actually sounds in fraud under the Consumer Fraud Act. That's correct. In the district court, we asserted four different causes of action. Violation of the New Jersey Consumer Fraud Act. Unjust enrichments and expressed and implied. All right, to just take a step back and again, in an effort to understand what Snapple's claims are here, because I'm not sure either side has helped us as much by providing clarity to that as they could. With respect to field preemption, which is what you take on most vigorously and specifically in your brief, what is the field here? Starting at a very basic level, what is the field that we're talking about? How general or how specific is it? Well, the concept of field preemption, Your Honor, exists when congressional intent is to occupy the field exclusively. Well, congressional intent is what carries the day with respect to all of the forums. The field, from our perspective, is the field of food and beverage labeling. So you're looking at it from a very broad? From a very broad standpoint, it's our contention that the field is the field of food and beverage labeling. And while the FDA and Congress have stepped in and have implemented regulations that are specific to certain areas of food and beverage labeling, they have not done so in other areas of food and beverage labeling. And it's those other areas of food and beverage labeling that our complaint is focused on. One of the reasons why this is where it kind of, I was going to say, slops into, segues into express preemption, when you've got 343K, you've got a limited express preemption provision with a safety clause, which says, you know, unless expressly preempted in this very narrow way, there is no preemption. So how can you say there's field preemption? I'm not saying there's field preemption, Your Honor. I'm saying there's not field preemption. I mean, how can you say that they, all right, I'm getting ahead of myself. What is the field, then? The field, as I say, it's... All labeling? All food and beverage labeling. Yeah, actually, I think the court, the district court acted as if the field was juice products, I think. It's a little hard to understand what the district court was ruling. I mean, it appeared to be field preemption, juice products, but if you read it carefully, she probably did address the other types of preemption. I thought that's what the district court was kind of viewing as the field was juice products. Which is narrower. Even if we were to narrow the field, and even if the field were to be narrowed specifically to juice products, I still think it would probably be for the court, and I still think the district court was narrowed for the decision to present. Can I ask you a question about how the FDA got to its policy on natural? Do you know much about the process by how it got there? In November of 19... Let me just check my notes so I have the exact date. I believe it was November of 1990. The FDA sent out a request for comment in regard to the use of the term natural. Prior to that, they had never taken a formal position on the use of the term. I'm sorry, it was actually November of 1991. 1956. So they were getting a lot of requests to do something about natural? They were looking to be able to clarify the term natural and the use of the term natural. The FDA had actually recognized that the use of the term natural was confusing and it was misleading to consumers, and to quote the Federal Register, that the use of the term natural frequently breached the public's legitimate expectations. Do you know how they got to their specific, more or less scientific conclusion about what was definitely not natural? I don't think that the FDA has reached a scientific conclusion as to what is or what is not natural. I know, but they've kind of taken a position on as long as it's not this thing, we're not going to do anything about it. Do you know how they got to that position? I don't know how they got to that position. It's possible that my adversary can provide the answer to that, but I don't know how they got to that position. Well, there's a difference between natural and artificial flavors and a definition of the word natural. They have never defined the word natural. They received the comments from their request in 91, and in 93 again said, we can't define it, we're not going to define it. And they also were unable to distinguish between natural and artificial flavors, and so they said they weren't going to try. So we don't seem to have any kind of a formal policy or definition at all with reference to natural. And on that, would you please clarify for me, the difference, if any, between a formal policy and a policy, because there seems to be something of a skirmish between the parties on that. You would concede that there is and was formulated as of 91 a policy of some sort with respect to what is natural. What I would say to that, Your Honor, I don't know that I would want to lock in the 1991 date, because I think what the regulations bear out is prior to 1991, the FDA did have in place some form of informal policy. You have referred to it as informal, and I think even Snapple has conceded that it may have been that prior to around 91, but they suggest some formalization of it post around that time, correct? Post 1991, in 1993, when the FDA publishes the comments, the FDA again comes out and says we are not going to define, for various reasons we're not going to define the term natural, we're going to maintain our policy, and our policy is. However, that policy that they were referring to was and continues to be the informal policy that they had in place. All right, formal or informal, they have a policy. Does, for preemption purposes, and this is perhaps a softball, does a policy have the force of law? Your Honor, it's our position that it does not, and I think that recent case law, both in the Third Circuit and the United States Supreme Court, establishes that that type of informal policy does not have the force of law. If I may, specifically, I'll refer to the Fellner decision, and Judge Smith, I believe that you stated. I didn't write it, that I was on the panel. That you were on the panel for the Fellner decision. In the Fellner decision, it dealt with a situation similar to this, where a federal organization had provided various opinions and consent decrees in regard to labeling and the dangers of mercury associated with the tuna product, and the Fellner court specifically held that informal policies, such as what we're dealing with here, do not have the force and effect of law. But we have, for purposes now of the obstacle preemption argument, Snapple would say, I'm sure, and they may be correct, that we do have something more here than what we had in Fellner, which was really nothing but a letter from the commission. We've got something more than that here, don't we? I don't think we do, Your Honor. Don't we actually have some efforts at enforcement here? Your Honor, we have efforts at enforcement, but we have efforts at enforcement that stop before we actually reach the enforcement process. Before the FDA reached the point where it said, we are going to start to regulate this, they pulled back and they said, we have neither the time nor the resources to be able to address this. We recognize that it's a problem. However, we are not going to take a step further to regulate it and actually make it have the effect of law. And that's very significant that the FDA made that decision after a period of comment, after a period of review, to take everything under consideration and say, we are not at a point where we can regulate and want to regulate this particular area. Mr. Lipinski, one thing you have not said, one word, in fact, you've not invoked, and it surprises me a bit, and I'll be interested very much to hear what your adversary says about this, and that is the word presumption. Especially in the wake of Levine, what is the role here, what is the weight here, what is the force here of the presumption against preemption? It was raised in our briefing, Your Honor, and I know that I haven't said it here today, so presumption. We feel that there is definitely a presumption against preemption in this particular case. In this particular situation where you are pulling away the rights of the consumers, there is a strong presumption against preemption, and we do feel that the presumption against preemption does apply in this particular situation. We'll get you back on rebuttal. Thank you very much. May it please the Court, my name is Mayor Beckwith, and I represent Snapple Beverage Corporation. Let me ask you my pithy little questions, and you've gotten a hint that they will be coming. Yes, Your Honor. You waived, is that the word? I don't know if that's the word. You disavowed. You disavowed. You did not proceed after they dropped their juice claims on field preemption or express preemption, correct? Your Honor, we wouldn't have absolutely judged Cooper or reached that issue sui sponte. Sui sponte. Those issues, one can argue, were technically not before her to reach, correct? Well, Your Honor, nobody has raised an issue that was of use and discretion. That's not my question. Those were not issues she was required to decide. Those were not issues she was required to decide based on the way the pleadings had changed. The plaintiffs had come forward and dropped their disparaged allegations. The appellant raises only field preemption. Yes, Your Honor. And you, as I suggested before, tongue-in-cheek, I think you're the appellant, are now raising express preemption, field preemption, and obstacle preemption. Did you ever file a cross-appeal on express preemption? No, Your Honor, we did not. And you don't tell us in your brief that you lost on express preemption grounds, and you don't tell us because you don't tell us you lost on express preemption grounds, or indeed that they were waived, you don't tell us why the district court was wrong in deciding against you. Our express preemption argument is actually different from the court's decision below. Our express preemption argument is solely wrestling with regulation of artificial and natural flavoring. Flavoring, did you ever raise that before the district court? Artificial and natural flavoring. Artificial flavoring as a basis for express preemption? I did not, Your Honor. You did not. You did not. And this court certainly can hold me to my word, although I agree with Your Honor that the waiver has been waived here and that this court may affirm on any ground. Well, affirm, but you keep saying that in your brief, and it struck me there's something wrong with that. We should affirm the district court on express preemption grounds, but you found against you. You found against you on express preemption. Yes, Your Honor. But you say page 11, page 14, 15, page 25, page 57, we should affirm the district court on all grounds and specifically express preemption, but she found against you. So you didn't mean to say that, did you? That's not the most artful phrase. No, I think that's a fair way of stating it. Your Honor, our express preemption. So you want us to reverse the district court on express preemption grounds, even though the issue wasn't before us when she decided that, and you never filed a false appeal saying she was wrong on express preemption grounds. Right? That is right, Your Honor. Okay. Now, they raise field preemption, and, of course, one can argue the only issue that should be before us, one can argue, is obstacle preemption, which they don't raise, but that's the one issue you did not disavow. I will not say another word. Can I ask a question about field preemption? Yes, Your Honor. After Wyeth was dealt with drug labeling, have you really got a field preemption argument? Yes, we do, Your Honor. And first let me answer the question as I get to that. The field here is juice, beverage, ingredient, label. And after Wyeth, Wyeth does not bar a field preemption analysis here. What's left? I'm glad Judge Rustani asked that question because at the more basic level, I refer to it as Levine, she's referred to it as Wyeth. What is left of field preemption after Wyeth or Levine? Because a lot of people are right. A substantial amount is left of field preemption after Wyeth and Levine and Felner. Your Honor, specifically the Wyeth court held and the Felner court held that simply having an express preemption decision or a cause does not wipe out field preemption. And here the field is drastically different. Beverage ingredient labeling, juice beverage ingredient labeling, spans hundreds and hundreds of pages of the Federal Register. Artificial labeling is natural labeling. You think it's more occupied than drug labeling? Your Honor, in this situation, we have hundreds of pages that tell Snapple and other beverage manufacturers exactly how labeling works. I'm asking you. That was my question. So the answer is yes, the field of juice beverage labeling is more occupied than the field of drug labeling was. Because Wyeth versus Levine said and specifically noted that what the FDA does in drug labeling is set the floor. So in that situation where Ms. Levine tragically lost her arm to gangrene as a result of an IV push of Phenergan, very different that the manufacturer could have come in and said don't do that. That's what Wyeth versus Levine says. Here the manufacturers are told precisely how to label. The nutrition facts, the artificial and natural flavors, the juice beverage percentages, the types of juice, the vignettes. Everything is controlled by the FDA. Specifically the artificial and natural flavoring regulations are a binary opposite. You're either an artificial flavorer or you're not an artificial flavorer. Okay, but in drug labeling, you have to get your drug label approved before you can even put it out. That sounds pretty occupied to me. It certainly is not occupied. The area, the Supreme Court said that it simply set the floor. In juice labeling, you don't have to send your labels to FDA to get approval of the juice label. We do not. It's a post-enforcement mechanism. The FDA has enforced the natural policy with four warning letters that we provide to your honors. It is a post-enforcement label. So in the situation with the FDA, the natural policy has been adopted following the artificial and natural flavoring regulations specifically cited there. And the manufacturers, in reliance on that, then can label their beverages. If the FDA doesn't like it, the FDA can bring a warning letter. It hasn't done so in 16 years since the natural policy has been in existence with respect to Snapple, but it can do so. It has in four situations that we provide as examples. This may sound like a trite characterization. It probably is, but a lot has happened since you argued this case before the district court. You've got Levine and you've got Fellner. My partner, Mr. Lampkin, is a lot smarter than I. He said the same thing. Judge Cooper didn't have the advantage, whether she took on issues that she should have or not. She didn't have the advantage of Fellner. Fellner came down in August, and I think she decided the case in June. Much has happened. I agree. Altria v. Good, Wyatt v. Levine, Fellner, Colesico, which I understand has been reversed. Colesico, I know Colesico. I didn't write it, but there's another one out there called Zeneca, and it came back along with another drug label. Zeneca, absolutely, much has happened. There's much water under the bridge. We do not deny that point. But in looking at the artificial and natural flavoring regulations and comparing it to the natural policy and the 2008 pronouncement and interpretation of that policy to the Corn Refiners Association, where the FDA said that high-fructose corn syrup can be labeled as all-natural, and looking specifically in that Corn Refiners letter to its policy, looking at that policy and then comparing it to high-fructose corn syrup as a product of enzymolysis, it concluded that it would not object to labeling high-fructose corn syrup as natural in 2008. If you look to the natural flavoring regulations, you see two things. You see that it requires that it derive from a fruit or a vegetable. Here, a vegetable by admission by the plaintiff, high-fructose corn syrup, is a vegetable by admission by the plaintiff from corn. And then there's a variety of processes that would make something a natural flavor. So you look to those processes. Here, enzymolysis, the same thing that turns yogurt and cheese from milk, from burgundy wine from grapes, here, enzymolysis by the plaintiff against own admission. Mr. Beckwith, given our acknowledgment that much has happened since this matter was decided by the district court and recognizing that the district court really based its decision on field preemption, obstacle preemption as kind of an alternative basis, and understanding your answer to Judge Rastani's question about how does field preemption still prevail here, given the fact that this does not seem to be as regulated an area as a drug label, isn't your best issue obstacle preemption now, even under Fellner? Your Honor, a substantial part of our brief and an issue we would ask for affirmation of the district court on is obstacle preemption. Conflict preemption applies in this case. Here we have a state claim that is frustrating the purposes and objectives of Congress and the FDA. I'm sorry. I really meant to say conflict and or obstacle preemption when I asked my question. As Your Honor has noted before, sometimes those terms are fuzzy and conflated. Well, you're not arguing impossibility. We are not arguing impossibility. You can call it obstacle preemption. The conflict you're talking about is obstacle preemption. Absolutely. And as I understand conflict preemption principles and jurisprudence, they're basically two branches. One is implied, one is obstacle. We are arguing obstacle for conflict preemption. The FDA acknowledges that it has not defined natural and acknowledges that the use of the word natural can be misleading. How, then, is there a conflict between appellant's lawsuit and federal law? I mean, isn't appellant's lawsuit entirely consistent with the concerns repeatedly expressed by the FDA? No, Your Honor. The appellants would ask that high-fructose corn syrup, in fact their very first question before the trial court, is whether high-fructose corn syrup is an all-natural ingredient. The FDA has answered that question. Congress directed the FDA to ensure proper labeling of beverages. Right. It's a disclosure requirement, isn't it? Your Honor, if high-fructose corn syrup is in a beverage, it needs to be labeled as a natural flavor. Right. But where does federal law explicitly approve of advertising products as all-natural and thus conflict with plaintiff's lawsuit? There's no prohibition against, and that's what this case is about, the marketing of products, not the disclosure of ingredients. What federal law governs is the label. And that label has to follow federal regulations. Here we have a 2008 interpretation of a 1993 policy. And to correct the record... You mean the letter from the employee at the FDA? The letter to the Corporate Finance Association interpreting the 1993 16-year policy... Just an employee can set federal policy for purposes of preemption? Employees can interpret binding policy on the FDA. This policy is binding on the FDA, and this policy directly interprets the artificial and natural flavoring regulations. Let me ask you a question. I thought I just heard you say that you are required to call this a natural product. Where is that? I don't see that you're required to call it a natural product. Didn't you just say that? You're required that high-fructose corn syrup is a natural flavor. You are required to label it as a natural flavor, Your Honor. Oh, if it's a natural flavor. So then that gets back to your express preemption argument that it's not an artificial flavoring, it's a natural flavoring. Well, in fact, don't on your products, don't you have natural flavoring at some points, for example, on diet Snapple, but you say all natural on non-diet products. So what we're talking about here is not the wording natural flavoring. We're talking about the all natural labeling, and there's nothing that requires you to put all natural on your labels.  Nothing requires us to call it that. Okay, then how can you have obstacle or conflict preemption? Obstacle preemption applies because the FDA, in interpreting the artificial and natural flavoring regulations, and those apply to our obstacle preemption analysis, issued its 1993 policy and said that it will maintain its current policy not to restrict the use of the term natural, that it will accept... Okay, not restricting the use of the term natural isn't mandating that you put all natural on there. Maybe you have to put on natural flavoring, but all natural is not required by the FDA, is it? All natural is not required by the FDA. It is consistent, though, with the natural flavoring regulations. So where is the conflict? Where is the obstacle? The conflict arises directly with the artificial and natural flavoring regulations, the 1993 policy... Well, they're not arguing that... You've injected the artificial flavorings into the case. You, Snapple. They're not arguing that high fructose, whatever it is, is an artificial flavor. In fact, they're not arguing it's a flavoring at all. They're arguing it's a sweetener. All natural flavoring. I'm not sure that there'd be any case here. But you put all natural. The label says on the front of the label, naturally flavored juice... But that's not what the argument is. The argument is with the all natural at the top. I understand, Your Honor. And all natural is a permissible labeling under the policy, under the regulations, and under the 2008... Maybe permissible. Maybe permissible. But now you're arguing obstacle of preemption. So permissible and obstacle... Remember in the drug case, there was no obstacle preemption because the Supreme Court said they could have changed their label or gone to the FDA to see their label changed. So you could put on all natural or you could not put on all natural. The way the plaintiff has pleaded her case, the first question is whether HSCS is an all natural ingredient. And the plaintiff concludes that it is artificial. That is the way the plaintiff pleads. Well, they deny that they conclude that. In their reply brief, Your Honor, specifically, they say that high fructose corn syrup is artificial. They specifically say that in their reply brief, Your Honor. And by saying that, they are creating a conflict with the binding policy. They keep saying it's not an artificial flavoring. See, this is where these words are getting... There is a distinction between natural flavoring and natural. There is a distinction between artificial flavoring and artificial. The only reason that high fructose corn syrup, Your Honor, is in the beverage is for the flavor taste, for sweetness. One of the four basic tastes, sweet, sour, bitter, and I'm missing one, salty. So, Your Honor, that is why high fructose corn syrup is in there. And it squarely meets the definition of natural flavoring. Accordingly, Snapple has labeled its beverages naturally flavored juice beverage from concentrate with other natural flavors on the front side of the package in addition to the all natural label. In the ingredient statement, it then discloses that there are natural flavors in it. To require a statement to allow a state court to now conclude that high fructose corn syrup is artificial falls squarely within the regulations, the policy, and the 2008 pronouncement saying that it... We're dealing with a process claim here, not an artificial or artificial flavorings claim. They're dealing with a process that they say is not natural, makes the HGFS, whatever it is, not natural. But not natural is not the same thing as artificial, is it? I think you've tried to change their claim into an artificial claim, and I'm not sure it's there. That is the word that the plaintiff used, artificial, and something is either natural or artificial under the regulations. The process... You're saying the plaintiff used it in her complaint or in the reply brief that you referred to? They described high fructose corn syrup as all sorts of things, one of which is artificial, Your Honor. The process... Where? I have the reply brief. Where are they arguing? They're talking about not natural. You know what they're talking about is citric acid in footnote 3. For the first time they're arguing another, a non-natural ingredient, which they can't get away with because they never raised that before. I'll ask them about that in my own way when he gets back up. But where are they saying? Tell me where. Your Honor, my notes are failing me at this exact moment. Oh, here, Your Honor, I'm sorry. And it was not the reply brief I had misspoken. It was the plaintiff's opposition to the motion to dismiss when they described HFCS as, quote, an artificial, highly processed ingredient at page 3 of that brief, and that is part of the joint appendix, and I can provide, Your Honor, with an pinpoint site. Your Honor, the process, though, that you were just speaking about, Your Honor, that's enzymolysis. That process is specifically allowed in the natural flavoring regulations squarely. It says that if something is derived from a vegetable, here admittedly corn, and it is derived from enzymolysis, the process I described earlier, it can qualify as a natural flavor. It is a natural flavor, Your Honor. They admit that enzymolysis is the process. This is not a dispute about the process. The process is what the process is, enzymolysis. It's squarely. I asked, one of the first questions I asked your friend after I got off his back on the procedures here was whether the claim is, he speaks of his claim as a, it's not natural because it is a synthesized ingredient, HFCS, not produced by a natural process. And that's the way I kind of understood it. It's a synthesized ingredient. The process specifically that creates that synthesis is enzymolysis. That is the one that the plaintiff admits is the process at issue here. That is the process that the FDA regulated in natural flavoring regulation. In that natural flavoring regulation, it said that products that were derived from enzymolysis are natural flavors. If you look at the artificial flavoring regulation, there's no process, there's nothing even similar to it. In fact, if it's from a vegetable, it automatically falls out of that process. It is much like- Is corn a vegetable? And do the federal regulations refer to it, or do listed vegetables include corn? I do not know that, whether that specific regulation does that, Your Honor. Your Honor, here's an example from the regulations. Food substances often fall into more than one category. That is something that plaintiffs admit. High fructose corn syrup is a good example. It is a natural flavor. It is a nutritive sweetener. In the regulations, here's what the regulations speak to. Strawberry shortcake. If you have strawberry shortcake dessert, and it is shortcake and strawberries, and you have sufficient ingredients of strawberries to give you some nutritive effect, you label that strawberry shortcake. If instead, the strawberries do not have a nutrition component, they're just added for flavor, you can label, and you are allowed to label them, naturally flavored strawberry shortcake. I thought you couldn't put beet juice into lemonade and have a- In the 1991 Federal Register, that's the reference, Your Honor. You cannot put beet juice- And that's coloring. And that's because it's of color. Yeah, but that's the same- would come under the same 343K. The coloring, not a flavoring. 343K is a misbranding of artificial flavors, Your Honor. Well, yeah, but it says you can't use artificial coloring, right? The policy, the 1993 policy, uses beet juice as an example, when used with lemonade, and it's a color. And what the FDA has generally said is that artificial colors, if something has any artificial color whatsoever, it cannot be labeled naturally. So that you can't put lemonade that's colored, pink lemonade, colored with beet juice as all natural, right? You cannot label beet juice, pink lemonade, as all natural. Does the FDA policy on natural say anything more than that, what we've just been referring to? The FDA on beet juice- The FDA policy on natural, does it say anything? Not natural flavor, unnatural. Does it say anything more than this reference to the addition of beet juice? To a specific beet juice lemonade example, it does not. I would turn you back to the federal- That's about the- I understand, but when confined to nothing more than attempting to say what natural means, how it's defined, that's as far as the FDA's gone. In 1991, when it did its second opening of comments, that is true. In 1993, when it was actually issuing this policy, it was saying we can't solve this for every situation, but for this situation we can. It said much. It said it will maintain its policy, that it is a current policy, that it would allow for the use of natural except for added flavors. Well, it talked about beet juice in 1993 also. I apologize. I'm not on beet juice. In the course of all that and the request for comment, has the FDA ever claimed, suggested, complained that a proliferation of state court suits would create problems in enforcement here? Is there anything in the record, the regulation, the rulemaking record here that would suggest that for purposes of making a case of conflict or obstacle? I have not seen that sort of pronouncement similar to what you would find in some of the other published cases. I have not seen that pronouncement, Your Honor. Let me follow up on that. Not just the FDA, but you yourself.  if you take all natural off. What would be your problem? Your Honor, the problem is going to be if the plaintiffs proceed to a jury verdict, and that jury verdict concludes in New Jersey that hydrochloric acid is artificial, then we confront in New Jersey the requirement that hydrochloric acid be labeled as an artificial flavor squarely against the regulation. Well, I'm not sure that's true because you keep conflating artificial flavoring with all natural as a reference to the whole product. They work in perfect symbiosis. What if the state court defines for the jury in a CFA claim, as we have here, natural in a way that's entirely consistent with the way the FDA has so far, and in, it seems to me, rather limited fashion, attempted to define it? Well, the question wouldn't be whether the state court ultimately concludes that in a preemption analysis. The preemption analysis is whether it creates that risk, whether it creates that risk of inconsistency at the outset in such a way that it is going to conflict. And if the state court here concludes that it's artificial, it flatly, squarely falls under the artificial flavoring regulations, and it conflicts with the policy, and it would conflict with the 2008 letter to the corn refiners saying that it can be labeled. It sounds to me you're arguing the express preemption regarding flavoring, which you didn't raise, and which probably doesn't apply here, and that indeed if you had a flavoring issue, you might have expressed preemption. But I thought that's not what we're talking about. Your Honor, for obstacle preemption purposes, we looked at all the policy, the 2008 interpretation, the 1995 reaffirmation through the Zamora letter of the policy, and the artificial and natural flavoring regulations. They all work perfectly together. If you look to the policy, Your Honor, it specifically cites to the artificial and natural flavoring regulations. Policy. May I return to a question I asked your adversary about the policy, because there was something of a skirmish, and I'm not sure what to make of it, between you and the other side over whether this was a policy or an informal policy, or if it was transformed from one to the other, and when and how. Is this a policy? Is this an informal policy? And does it matter, because ultimately, does the policy have the force of law? It is a policy, Your Honor. It was issued after four years of notice and comment. That comment period opened in 1989. You find that in the 1991 Federal Register. It is binding on the FDA, and it is being enforced by the FDA through warrants. Does it have the force of law or purposes of preemption under Supreme Court preemption jurisprudence? It doesn't, does it? Your Honor, it has to be interpreted with the artificial flavoring and natural flavoring regulations. It is an interpretation of those artificial and natural flavoring regulations, and under that, it's the entirety of our versus Robin's deference. And then, with the 2008 letter to the Corn Refiners Association, including the Tiger Fist corn syrup, Let's go back to fundamental principles. At the heart, at the bottom of any preemption analysis is a question of congressional intent. Correct? Yes, Your Honor. We, at the editorial, we are stretching here, looking for all kinds of things that maybe would support or wouldn't support, and informal versus formal. But at bottom, does anyone really see that? Where is there an intent? Where do you get a clear intent from Congress to preempt in this area? I can point you to several different locations, Your Honor. First of all, Congress directed the FDA to ensure that foods were properly labeled. Gave them the discretion to do so, which includes the discretion not to impose regulations. Correct? And the FDA has exercised that discretion and published literally hundreds and hundreds of pages of regulations on precisely how beverages in the United States are to be labeled, which has the goal of national uniformity and to promote interstate commerce. Senator Hatch spoke to this specifically. We cite to this in our brief when he said, it is wrong to permit each of the 50 states to require manufacturers of 20,000 packaged food items to display different labels and health and diet information on identical products. Well, we're not talking about a failure to include an ingredient on a label. We're talking about the marketing of something as all natural, and that's quite a different thing, isn't it? Your Honor, as I explained earlier, high fructose corn syrup here falls squarely within the natural flavoring definition. If it does so, it is entitled to be labeled as natural, all natural, and to be labeled as naturally flavored juice beverage from concentrate with other natural flavors. Senator Hatch's comment that I was speaking to addresses specifically the congressional intent that the FDA occupy this field. The FDA has still occupied it through the adoption of the Artificial and Natural Flavoring Regulations. But since Senator Hatch spoke, a lot has happened, too, hasn't it, in the area of field preemption? Time hasn't happened in the movement, yes, Your Honor. Your Honor, thank you. Thank you. Mr. Lipinski. Your Honor, thank you very much. A few points that I just want to bring up that were raised by my adversary. First of all, there was a lot of reference to differentiation between artificial flavor and or natural flavor. The first point that I want to bring up is that defendant or appellee can point nowhere to anything in the federal regulations that establishes the fact that high fructose corn syrup would be considered an artificial flavor. They themselves said it's an artificial flavor because the FDA recognizes it as a sweetener. The FDA has the ability to recognize a product as both a sweetener and as a flavor. And the FDA, at its discretion, has chosen not to recognize high fructose corn syrup as both a sweetener and a flavor. They've limited the recognition to that of a sweetener. Therefore, when we get into— Is not a sweetener a flavor? Is not a sweetener a form, a subset of flavor? If that were the case, Your Honor, then there wouldn't be the need to have regulations that deal with sweeteners. There wouldn't be the need to label something as a sweetener unless the FDA, at its discretion, chose to make that note in the regulations saying sweeteners are flavors. And what SNAP was looking to do is SNAP was looking to read into the regulation something that's not there in order to be able to hold up the preemption flag and they shouldn't be allowed— You don't have anything— You can't show us a citation for your proposition that sweeteners are distinct from flavors. Can you? What I did put in the record, Your Honor, were references to the FDA food additive— Bear with me one second. The FDA food additive status list I cited in our reply indicates that it designates— You mean the 107 thing? Yes, Your Honor. But that's not precisely on point. That's not really as on point in this case. That's a very— That's about all you've got and it's out there. Your Honor, that's all I've got, but it's more than they've got because they're standing here asking you with open, empty hands to buy what they're saying. I'm standing here with at least a little bit in my hand saying here's what the FDA has done as an example of why this is a sweetener and not a flavor. And from an FDA policy standpoint, I have a little bit, they have nothing, Your Honor. Another point that I want to bring up— Well, you better not say you only have a little bit because I think if this were to be reversed, they'd still go back to the district court on their motion to dismiss— Yeah, but the good thing is it's not our problem. Yeah, that's right. Another point I want to address is that my adversary kept on referring to beverage ingredient labeling and the vast amount of regulations involving beverage ingredients. We're not standing here before the court and we didn't argue in front of the district court that we're challenging anything to do with beverage ingredient labeling. Our focus is in and around all the regulations, their right and whether they have a right and we're preempted from challenging the use of the term all-natural on their product. Nothing in regard to nutritional content, nothing in regard to ingredients. So I don't think that that argument has any weight. Okay. Let me get back to this artificial flavor. The district court didn't deal with this because it wasn't raised. That's correct. But I'm wondering what position we are in if it is actually expressly preempted. Do we have any discretion to address the issue? Might we remand it to the district court to decide the issue? Where are we with that? Because, I mean, I really don't know very much about the difference between artificial flavorings and artificial sweeteners. If I understand your question correctly, you're asking if the FDA has determined that high-fructose corn syrup is an artificial flavor, do... No, I'm asking... I'm asking if we don't know the answer between sweeteners and flavorings, then where are we in this case? Because flavorings are preempted expressly. So if we don't know the answer, what are we supposed to do? I would think in that situation, Your Honor, I would think that you would have to remand the case back to the district court, and you'd have to provide the opportunity for briefing as to whether or not this product is deemed by the FDA to be an artificial flavor or not. You're not even arguing that it is. I'm sorry? You're not even arguing that it is. That's correct. It's not my argument, because the argument was never raised in the lower court. That's right. The argument wasn't brought before... was not raised until we were here at the appellate division. So we would just assume... just it's waived for purpose of this case and let the next case figure it out. Well, in my opinion, it is waived for this particular case. All right. Another point that I'd like to be able to hit on is our adversary referred quite often to the July 3, 2008, letter to the Corn Response Association. And the Fellner Court... Excuse me. I'm sorry to interrupt you. Sure. And I've been thinking about this for a minute, trying to decide whether it's worth asking you, but as we grapple with this artificial flavoring versus natural flavoring versus natural issue, can we make anything out of Snapple's own beverage label? Because in having looked at the label for... how do you pronounce the name of the blackberry juice? I don't drink this stuff. I believe it is Asahi, but I don't know the experts on that. All right. Three syllables out of what would appear to a country boy like me to be two. All right. I just call it blackberry juice. The label lists ingredients that make it sound like Snapple itself does not consider HFCS to be... to fall under the flavoring regulation. It lists filtered water, high fructose corn syrup, pear juice from concentrate, citric acid, natural flavors, vegetable extract, and the Asahi gum. Can we make anything out of that, the fact that there seems to be a separation between natural flavors and the HFCS? I think you can, by implication, take Snapple's understanding from that, and that could very well be the reason I don't want to wax poetic as to why they may or may not have made choices, but that wasn't brought up at the district court level, and that could be a reason why. You're not arguing the flavorings are not natural? No. No, you're not arguing that. Your Honor, I'm before the district court and this court, and I don't believe anywhere in my complaint I ever mentioned flavor, and I had to agree with the term flavor. That's right. Your friends have gone into this in the red brief. But I've never understood you to be arguing that the flavorings were not natural. Your Honor, the product is formulated, I have an issue with two words. All natural. And those words put together on the label is where I have my issue. Well, you're not arguing, because if you accepted that high fructose corn syrup was a flavoring, then you would have no case. Well, now that flavoring has been raised, yes, it's my stance that high fructose corn syrup is not considered a flavoring. But that's, again, that's not an issue that I'm putting before the district court to be decided. The district court, in its discretion, is being asked to decide whether or not the use of the term all natural on the product label, on a product that contains high fructose corn syrup, is false and or misleading under the New Jersey Consumer Law Act. That's really the issue. That's the question that's before the court. In the last minute that I have, if I could again just go back to this July 3rd letter, and my adversary several times referred to that letter and said that that letter has a preemptive effect, and I just wanted to be able to again point to the Fellner case, and the points brought up in the Fellner case specifically stating that an informal letter such as that, although it may be expressing the opinion of the FDA, does not have a preemptive effect because it was not determined under formal measures. It was a letter that was determined under informal measures. But there also is not a policy in Fellner as there is here, right? In Fellner, no there was not. Nor enforcement efforts as there are. Right. And in regards to the enforcement effort, there is a difference between an FDA decision to enforce and or not enforce as compared to a state law and a decision on behalf of a consumer to enforce their rights under the laws of the state. And I think that that's an important distinction that has to be made when you get into a conversation of enforcement. The fact that the FDA has chosen not to enforce does not preclude consumers from enforcing their state law rights. I see that my time is up. Let me ask you just to make sure Sure. of the answer to this. You have in, I know three of your reply briefs, citric acid is also not natural. You're not seriously pressing that, are you? No, Your Honor. Okay, that's it. Thank you very much. Thank you. This case has been extremely well argued. It is a very difficult case as you could probably tell from the arguments. We will take it under advisement. The clerk will adjourn the court, please.